**Darian Stanford**, OSB No. 994491
  Direct Dial:  503.802.2028
  Fax:  503.274.8779
  E-Mail:  darian.stanford@tonkon.com
**Michael Willes**, OSB No. 141806
  Direct Dial: 503.802.5737
  Fax: 503.274.8779
  E-Mail: michael.willes@tonkon.com
**Kalia Walker**, OSB No. 154434
  Direct Dial: 503.802.2031
  Fax: 503.274-8779
  E-Mail: kalia.walker@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204

Of Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| YELA FIDUCIARY SERVICES, LLC, personal representative for the Estate of Alyssa Marie Sund, Deceased; and EMERY SUND, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> BENTON COUNTY, an Oregon county; LANCE LOBERG, M.D., an individual; JON SOBOTKA, M.D., an individual; NICOLE KELLEY, an individual; SCOTT JACKSON, an individual; DIANA RABAGO, an individual; EVAN MOHR, an individual; MELISSA WERDELL, an individual; MATTHEW BLACKSHEAR, an individual; CALLIE DUGGER, an individual; ETHAN GARRISON, an individual; JONATHAN HERRICK, an individual; DOREE JOHNSON, an individual; PAUL LANCASTER, an individual; NICHOLAS MILLER, an individual; TANNER SPARKS, an individual; THOMAS WHITE, an individual; and JOHN DOES 1–9, <br><br> Defendants. | Civil No. 6:20-cv-1925 <br><br> **COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983) AND SUPPLEMENTAL STATE CLAIMS** <br><br> **DEMAND FOR TRIAL BY JURY** |

**Page 1 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

## INTRODUCTION

1.        On the afternoon of December 19, 2018, Alyssa Sund (then age 41) and her husband Emery Sund were booked into the Benton County Jail.  Alyssa Sund was a medically fragile person who was taking a number of prescription medications and had a history of illegal drug use.  Over a period of 91 hours, Alyssa Sund experienced a series of serious medical complications (including an asthma attack, continuous vomiting, and back and stomach pain).  She never saw a doctor.  The jail nurse saw her once early in her stay at the jail.  That nurse did not perform any type of physical examination, did not check Alyssa Sund's vital signs, and did not provide Alyssa Sund's prescription medications.  The jail nurse then left for vacation without arranging for anyone to cover her shifts.  Emery Sund could hear Alyssa Sund vomiting and calling out for him.  He repeatedly asked the Benton County Jail employees to help his wife.  Instead of helping her, those employees concluded that she was only pretending and punished her by placing her in a holding cell without a sink or a toilet.  Shortly after noon on December 23, 2018, Alyssa Sund was found dead in her cell.  She had been dead for a significant period of time, even though jail employees were supposed to check on her every hour.  Alyssa Sund is survived by her husband, her mother, and three children.

## JURISDICTION AND VENUE

2.        This action arises under the Constitution and laws of the United States and jurisdiction is based on 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).  This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

3.        Plaintiff Yela Fiduciary Services, LLC, is the duly appointed personal representative of the Estate of Alyssa Sund, deceased.  Alyssa Sund was born in Phoenix,

Arizona in 1977. At the time of her death, Alyssa Sund was a citizen and a resident of the State of Oregon. She is survived by her husband, Emery Sund; her mother, Elise Butler; and her three children.

4.      Plaintiff Emery Sund is a citizen and resident of the State of Oregon.

5.      At all times herein pertinent, Alyssa Sund and Emery Sund were pretrial detainees in the Benton County Jail.

6.       Benton County is an Oregon County. Benton County operates a jail, known as the Benton County Jail. Benton County has a duty to provide all necessary medical care to pretrial detainees and persons convicted of crimes being held in the Benton County Jail.

7.      Lance Loberg, M.D. is a doctor licensed by the State of Oregon. On information and belief, at all times pertinent, Dr. Loberg had a contract with Benton County to provide medical services in the Benton County Jail. On information and belief, he is a citizen and resident of the State of Oregon.

8.      Jon Sobotka, M.D. is a psychiatrist licensed by the State of Oregon. On information and belief, at all times pertinent, Dr. Sobotka had a contract with Benton County to provide medical services in the Benton County Jail. On information and belief, he is a citizen and resident of the State of Oregon.

9.      Nicole Kelley is a registered nurse licensed by the State of Oregon. At all times pertinent, Ms. Kelley was employed by Benton County as a nurse in the Benton County Jail. On information and belief, she is a citizen and resident of the State of Oregon.

10.      Scott Jackson is the Sheriff of Benton County. On information and belief, he is a citizen and resident of the State of Oregon.

11.     Diana Rabago was a Benton County employee who at all times pertinent was a Captain and the Commander of the Benton County Jail.  At all times pertinent, Captain Rabago was responsible for the day to day operations of the Benton County Jail.  On information and belief, she is a citizen and resident of the State of Oregon.

12.     Evan Mohr is a Benton County employee who is a Sergeant at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

13.     Melissa Werdell is a Benton County employee who is a Sergeant at the Benton County Jail.  On information and belief, she is a citizen and resident of the State of Oregon.

14.     Matthew Blackshear is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

15.     Callie Dugger is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, she is a citizen and resident of the State of Oregon.

16.     Ethan Garrison is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

17.     Jonathan Herrick is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

18.     Doree Johnson is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, she is a citizen and resident of the State of Oregon.

19.     Paul Lancaster is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

20.     Nicholas Miller is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

21.     Tanner Sparks is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

22.     Thomas White is a Benton County employee who is a Deputy at the Benton County Jail.  On information and belief, he is a citizen and resident of the State of Oregon.

23.     John Does 1 through 9 are Benton County employees who interacted with Alyssa Sund or Emery Sund between December 19, 2018 and December 23, 2018.  At all times herein pertinent, defendants John Does 1 through 9 were acting under color of state law.

## FACTUAL ALLEGATIONS

### Benton County Has A Duty to Provide Medical Care to People in the Jail

24.     The Benton County Jail houses pretrial detainees and persons convicted of crimes.

25.     Benton County and Sheriff Jackson are obligated by state and federal law to provide medical care for persons lodged at the Benton County Jail.  This duty to provide medical care is a nondelegable duty.

26.     The Benton County Jail is the smallest jail per capita of any county in Oregon. The Benton County Jail has 40 beds, but it is considered "at capacity" when it houses between 28 and 35 people.

27.     The Benton County Sheriff's Office describes the medical services at the Benton County Jail on its website (the "BCSO website").

28.     The BCSO website states that jail deputies "screen for medical and/or mental health issues" and that "[u]nder the guidance of our jail nurse, they also administer medications and carry out inmate medical orders."

**Page 5 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

29.    The BCSO website states: "A jail physician is available by phone 24 hours per day and provides an onsite medical clinic once per week."  In December 2018, Dr. Lance Loberg was the jail physician.

30.    The BCSO website states: "Mental health personnel are also utilized; a psychiatrist holds an on site clinic every other week and a psychologist provides both group classes and one-on-one time with inmates."  In December 2018, Dr. Jon Sobotka was the jail psychiatrist.

31.    The BCSO website states: "A registered nurse is on site 30 hours per week.  The nurse screens new inmates for medical needs.  Many inmates come in with injuries, chronic medical conditions, prescription medications, or other health issues.  The nurse provides sick call for the inmates that have submitted a medical request."  In December 2018, Nicole Kelley was the jail nurse.

32.    The BCSO website states: "These inmates are triaged and treated by the nurse or referred to the physician or psychiatrist if necessary.  The nurse also provides physical exams and tuberculosis testing for inmates that have been in custody for 14 days."

33.    The BCSO website states: "Medical services are provided in the 10' by 14' medical office.  This small space serves as a medical office, exam room, medication room, medical supply storage, and records storage."

34.    The BCSO website states: "The nurse's strict 30-hour work week leaves little time for in depth staff training, inmate health education, continuing education, etc."

35.    The BCSO website states: "For inmate medical needs that occur during the nurses [sic] off hours and cannot be met by the corrections staff or the medical doctor via the phone, the

Good Samaritan Regional Medical Center Emergency Department is utilized.  This is a very expensive, but sometimes unavoidable necessity."

36.     The Good Samaritan Regional Medical Center Emergency Department is located less than four miles from the Benton County Jail.

37.     The National Commission on Correctional Health Care publishes "Standards for Health Services in Jails" ("NCCHC Standards").  All NCCHC Standards set forth herein were in effect during 2018.

38.     NCCHC Standard J-A-01 states that it is "essential" that "[i]nmates have access to care for their serious medical, dental, and mental health needs."  The standard provides that "[a]ccess to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered."  The standard notes that "[i]nmates must have access to care to meet their serious health needs. This is the fundamental principle on which all National Commission on Correctional Health Care standards are based and is the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble*."  The standard gives several examples of "[u]nreasonable barriers to inmates' access to health services," including "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care."

39.     NCCHC Standard J-C-04 states that it is "essential" that "[c]orrectional officers are trained to recognize the need to refer an inmate to a qualified health care professional."  It further states: "[b]ecause correctional personnel are often the first to respond to problems, they must be aware of the potential for emergencies that may arise, know the proper response to life-threatening situations, and understand their part in the early detection of illness and injury."

40.    NCCHC Standard J-D-02 states that it is "essential" that "[m]edications are provided in a timely, safe, and sufficient manner."  It further states: "[i]nmates entering the facility on verifiable prescription medication continue to receive the medication in a timely fashion, or justification for an alternate treatment plan is documented."  The standard notes that "[m]edications must be taken as prescribed in order to maintain a therapeutic dose; failure to do so may have grave consequences to patient health. Therefore, inmates being admitted who report currently taking medications or who bring the medications with them are to continue their medication unless there is a clinical reason to alter or discontinue it."

41.    NCCHC Standard J-D-07 states that it is "essential" that "[t]he facility provides 24-hour emergency medical, dental, and mental health services."  NCCHC Standard J-D-07 explains that "[e]mergency medical, dental, and mental health care is care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled sick call or clinic."

42.    NCCHC Standard J-E-02 states that it is "essential" that "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met."  The term "medical clearance" is defined as "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room."

43.    NCCHC Standard J-E-05 states that it is "essential" that "[m]ental health screening is performed to ensure that urgent mental health needs are met."  It further states: "[i]nmates who screen positive for mental health problems are referred to qualified mental health professionals for further evaluation."

**Page 8 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

44.    NCCHC Standard J-F-01 states that it is "essential" that "[p]atients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards."

45.    NCCHC Standard J-F-04 states that it is "essential" that "[i]nmates who are intoxicated or undergoing withdrawal are appropriately managed and treated."  It further states: "[i]nmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility."  NCCHC Standard J-F-04 also states that it is "essential" that "[i]ndividuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved."

### Benton County Has Known About Problems at the Jail for Years

46.    The Benton County Jail was built in 1976 as a temporary facility that would last approximately 10 years and would be replaced by a regional jail system built by the Oregon Department of Corrections.  Because that regional jail system was never built, the Benton County Sheriff's Office continues to use the Benton County Jail.

47.    In 2000, Benton County voters rejected a bond measure to build a new jail.

48.    In 2001, Benton County voters rejected a bond measure to build a new jail.

49.    In July 2013, DLR Group prepared a Jail Needs Study Final Report for Benton County (the "DLR Group Report").  The DLR Group Report noted that "the system has reached a point where a new jail is not just about meeting overcrowding issues, but rather a need to replace a deteriorating building that has the potential of being unsafe for deputies and inmates." The DLR Report also noted that the jail had 20 hours per week for medical staff, and it recommended 40 hours per week for medical staff in a new jail.  The DLR Report explained that

**Page 9 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

the proposed new jail would have a centralized nurse station, interview and exam facilities, and patient rooms.

50.    In November 2014, Sheriff Scott Jackson and Captain Diana Rabago spoke to a reporter about problems with the jail.  Captain Rabago explained that the jail no longer had programs for the people being held in the jail.  She said: "I feel that we're pretty much warehousing people now."  Sheriff Jackson described the jail as "a critical weakness in our criminal justice system."

51.    In June 2015, Captain Diana Rabago spoke to a reporter about problems with the jail.  Captain Rabago said: "We used to be Benton County Corrections Facility.  Now we're Benton County Jail, because we're not correcting anything."

52.    In August 2015, Benton County announced a bond measure to build a new jail.  Benton County District Attorney John Haroldson said: "If we offer safe and humane facilities then those facing accountability will have an opportunity to change and contribute to society."

53.    In November 2015, Benton County residents rejected the bond measure to build a new jail.  A spokesman for Benton County named Rick Osburn stated: "The commissioners are going to have to evaluate the results.  Figure out what their strategy is going to be and move forward based on that.  The fact of the matter remains that Benton County's jail situation hasn't changed at all."  Anne Schuster, one of the Benton County Commissioners, said that the jail "is in horrible shape.  We have to take care of our facilities—it's part of our job."  Another Commissioner, Jay Dixon, said that a larger, modern jail was sorely needed and that he would keep trying to get one built.  He told a reporter that "a federal judge can come in and say, 'You will build a new jail, and I don't care how you do it.'"

54.     In April 2016, Rory Holmes died in the Benton County Jail as a result of an acute asthma attack.  Benton County Undersheriff Greg Ridler told a reporter that no new policies were put place as a result of his death.

55.     In February 2018, Benton County launched a Criminal Justice System Assessment (the "CJS Assessment").

56.     In May 2018, Benton County held a Data Report-Out and Community Meeting as part of the CJS Assessment.  A presentation from that event stated: "The jail continually struggles with the increase of inmates with mental illnesses, drug issues, and those with Co-occurring disorders.  They enter and become 'stuck' in the system."

57.     In June 2018, Captain Diana Rabago spoke with a reporter from The Daily Barometer (the student newspaper at Oregon State University).  Captain Rabago said: "There's a lot of folks that don't understand what a jail is.  How it operates and what you're actually responsible for by law.  You really have to look at it like you're operating a little city."

58.     In July 2018, Benton County held a Community Workshop on Evidence Based Practices as part of the CJS Assessment.  A presentation from that event stated: "A sobering center provides a safe respite environment for chemically dependent individuals who are waiting to be referred or placed in the identified placement/confinement.  It is specifically designed and staffed to receive intoxicated individuals."

59.     In October 2018, Benton County held a community forum to present the draft CJS Assessment Report.  A presentation from that event stated:

- "Staff and incarcerated individuals in the jail talk about the increase of inmates with mental illnesses, drug issues, and those with co-occurring disorders."

- "These people enter and become 'stuck' in the system."

- "Many of these individuals are low-risk offenders, but individuals with high needs—the exact proportion in this category is unknown due to limited screening data[.]"

**Page 11 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

- "Psychotropic medications account for 30% of medication costs—please note, these are also the more expensive medications[.]"

- "These medications are used for people experiencing schizophrenia, bipolar disorders, depression, anxiety[.]"

- "While we do not have local data, national statistics on substance abuse and dependence are sobering[.]"

- "The current facility has minimal resources and opportunity available for inmate treatment and services.  Plumbing and electrical has exceeded life span and is in continuous state of failure.  The Jail is a deteriorating building that has the potential of being unsafe for deputies and inmates[.]"

- "The current jail facility fails to meet justice system needs and represents a major potential liability for the County."

60.    On January 15, 2019, Benton County released the CJS Assessment Final Report

(the "Final Report").  The Final Report contained the following findings:

- "The Benton County Jail does not assess offender program needs and provides minimal program opportunities.  Incarcerated offenders have little access to rehabilitative programs such as mental health, substance abuse treatment, educational support, and other services that reduce the likelihood of repeat offending."

- "Key justice system facilities—the jail, the courthouse, and the law enforcement center—are all in poor physical condition and have serious operational deficiencies."

- "Current programs [in the jail] are limited to Narcotics Anonymous, Alcoholics Anonymous, and religious services."

- "Mental health services at the jail are similarly limited.  Currently, Benton County Behavioral Health staff visit the jail weekly to see inmates who have requested services.  A psychiatrist provides service one day per week.  There are indications of significant need for mental health services in the population.  Through April of 2018, jail staff offered full mental health screening to 151 inmates.  Of those, 100 persons were screened, with 48 showing a need for further mental health evaluation and/or treatment.  In addition, about 1/3 of spending on pharmaceuticals at the jail is for psychotropic medication."

- "Separating male and female inmates from sight and sound contact is also problematic."

- "The physical condition of the jail is also inadequate.  The facility is a deteriorating structure that has the potential of being unsafe for deputies and inmates."

- "The jail does not assess offender program needs and provides minimal program opportunities.  The jail population appears to have a significant number of inmates with mental health treatment needs."

- "The physical condition and layout of the jail facility is extremely poor."

- "The development of in-custody programs for substance abuse treatment, mental health treatment, cognitive behavioral therapy, and education would provide needed opportunities for rehabilitation in jail."

- "The County requires a new jail facility with adequate capacity to support law enforcement and the courts, with a design that provides the opportunity for delivery of effective rehabilitative programs."

**December 19, 2018—Alyssa and Emery Sund Are Booked Into the Benton County Jail**

61.     On Wednesday, December 19, 2018, at approximately 4:22 p.m., Albany Police Officer Mike Wood arrested Alyssa Sund and Emery Sund for burglary in the first degree, theft of services and criminal mischief in the third degree.  Alyssa and Emery Sund were living without permission in a home that was for sale.

62.     Officer Wood transported Alyssa and Emery Sund to the Benton County Jail. They arrived at the Benton County Jail at approximately 5:15 p.m.

63.     Benton County Deputy Kate Libra assisted Ms. Sund when she was booked into the Benton County Jail.  Ms. Sund told Deputy Libra that her arm was "messed up" and that she had PTSD.  Deputy Libra escorted Ms. Sund from Officer Wood's patrol car into a holding room, then searched and fingerprinted Ms. Sund.  She said that Ms. Sund was cooperative and complained about being cold.  She also said that Ms. Sund complained that the search was "traumatic" for her.  Deputy Libra told investigators that "she knew Alyssa Sund was in the booking room for a while talking with the deputies in there about her medical needs."

64.     Sergeant Evan Mohr booked Ms. Sund into the Benton County Jail at approximately 6:20 p.m.  Sergeant Mohr completed an Inmate Screening Report for Ms. Sund. He noted that Ms. Sund reported heart problems, asthma, thyroid cancer, arthritis, dental problems, PTSD, stomach issues, fibromyalgia, migraines, liver issues and lupus.  She reported that she was taking "metoclopramide, celebrex, baclofen, gabapentin, zanaflex, ibu, relpax,

alprazolam, albuterol." Sergeant Mohr noted that Ms. Sund did not have any of her medications when she arrived at the jail and that she did not have anyone who could bring her medications to the jail. Sergeant Mohr told investigators that Ms. Sund "told him more than once that she is sick and needs her medicine, but did not relate anything to him that made him think she needed immediate medical attention or needed her medication that night." He estimated that his interaction with Ms. Sund lasted for approximately twenty minutes.

65.     At approximately 7:13 p.m., Ms. Sund was housed in Cell 14, which is located in the main hall.

66.     At approximately 7:20 p.m., someone completed an Initial Arrestee Screening form for Ms. Sund. The form indicated that Ms. Sund did not need immediate medical attention but "needs to be seen by medical for meds."

### December 20, 2018—Alyssa Sund Has an Asthma Attack and Is Moved to a Holding Cell for Observation

67.     On Thursday, December 20, 2018, at approximately 2:50 a.m., Deputy Thomas White went to Ms. Sund's cell because Ms. Sund was knocking on the cell door. Ms. Sund told Deputy White that she was having an asthma attack. Deputy White contacted Sergeant Melissa Werdell, who responded to Ms. Sund's cell.

68.     When Sergeant Werdell arrived at her cell, she noticed that Ms. Sund was having some trouble breathing. Ms. Sund told Sergeant Werdell that she normally takes an albuterol inhaler. Sergeant Werdell asked Ms. Sund if she wanted to use one of the albuterol inhalers that they keep in stock at the jail. Ms. Sund said that she did want to use a stock inhaler. Sergeant Werdell went to the medical room and got an albuterol inhaler. Sergeant Werdell reported that Ms. Sund took two puffs off the inhaler and seemed to be breathing better, then took an additional puff a few minutes later.

**Page 14 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

69.     Ms. Sund's medical record contains a section for "Physician's Orders."  One entry in that medical record is dated December 20, 2018 and timed 2:50 a.m.  The entry states: "Albuterol HFA 2 puffs PO done now."  The entry then states: "to Dr. Loberg/Sgt. Werdell/[illegible]."

70.     On information and belief, Sergeant Werdell did not speak with any medical professionals before giving an albuterol inhaler to Ms. Sund.  Albuterol is a prescription medication.

71.     Sergeant Werdell offered to move Ms. Sund to Holding Cell 1 so that she could be monitored more closely.  Ms. Sund said that she would prefer the holding cell.  Deputy White reported that they got a new mattress for Ms. Sund because she was complaining of back pain.

72.     After Ms. Sund was moved to Holding Cell 1, the jail staff began a "Close Observation Log" for her.  This log indicated that Ms. Sund suffered an "asthma attack"  and was "given inhaler."  According to the log, a member of the jail staff checked on Ms. Sund at least once an hour.

73.     Deputy White served breakfast to Ms. Sund at approximately 6:30 a.m.  Ms. Sund asked Deputy White for ibuprofen because her back was sore.  Deputy White gave her some ibuprofen.

74.     Sergeant Werdell spoke with Nurse Nicole Kelley at approximately 7:00 a.m. about the events involving Ms. Sund overnight.  Sergeant Werdell told Nurse Kelley that Ms. Sund had suffered an asthma attack and that Sergeant Werdell gave Ms. Sund one of the stock inhalers from the medical room.  Sergeant Werdell also told Nurse Kelley that Ms. Sund's inhaler was in her property that was taken from her at booking.

75.     Nurse Kelley reviewed the Inmate Screening Report and Initial Arrestee Screening for Ms. Sund when she began her shift around 7:00 a.m.  Nurse Kelley retrieved Ms. Sund's inhaler from her property.

76.     At approximately 8:30 a.m., Nurse Kelley met with Ms. Sund in the holding area. Nurse Kelley gave Ms. Sund her inhaler to keep with her.  She spoke with Ms. Sund about the medications she listed at booking.  Nurse Kelley asked Ms. Sund if anyone could bring those medications to the jail.  Ms. Sund responded that her husband was the only person who could bring her medications, but he also was being detained in the jail.  Ms. Sund said that she asked Albany Police Officer Wood to bring her medications with her, but he grabbed the wrong backpack.

77.     Nurse Kelley told an investigator that "the jail does not provide a majority of the medications Alyssa Sund listed, as the jail does not dispense controlled substances."  Nurse Kelley also told an investigator that the medications listed by Ms. Sund were "for things like anxiety and pain, but nothing for things like high blood pressure, diabetes, seizures, or other things of a more serious nature."

78.     The medications listed by Ms. Sund treat a wide variety of conditions, including GERD (metoclopramide), seizures (gabapentin), and migraines (relpax).  In addition, Nurse Kelley wrote an additional medication (ropinirole) on the Inmate Screening Report.  Ropinirole treats restless leg syndrome.

79.     Nurse Kelley entered the following chart note into Ms. Sund's medical record to summarize this visit: "Pt booked yesterday evening.  Per Sgt Werdell, pt requested an inhaler during the night and was allowed to use a stock inhaler.  Pt was moved to H-1 for observation.

**Page 16 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

This am, pt was provided [with] her own inhaler from her property and allowed to keep in her

cell.  Pt advised to try to have own meds brought in if not released at court today.  New orders."

80.    Ms. Sund's medical record contains a second entry in the section for "Physician's

Orders."  The second entry in that medical record is dated December 20, 2018 and untimed.  The

entry states: "ProAir HFA 2 puffs PO old PRN [illegible]."  The entry then states: "to Dr.

Loberg/[illegible]."

81.    Nurse Kelley entered the ProAir order into the Medication Administration Record

("MAR").  She also entered the Ventolin order into the MAR for the overnight use of the stock

inhaler.  She did not enter any other medications in the MAR.

82.    There is no indication in Ms. Sund's medical record that Nurse Kelley took Ms.

Sund's vital signs or performed any type of an examination of Ms. Sund.  There is no indication

in Ms. Sund's medical record that Nurse Kelley contacted a doctor about Ms. Sund.

83.    At approximately 1:00 p.m., Ms. Sund was moved from Holding Cell 1 back to

Cell 14 in the main hall.  There is no documentation about why the close observation period

ended at this time.  Sergeant Mohr wrote in his report: "I was told that graveyard shift had

moved Sund to the waiting room because she had been complaining of not feel [sic] good.  I was

also told that Sund had been seen by the nurse and was cleared to be moved back to the main

hall.  Not long after my shift began, I had one of the deputies on duty move Sund back to cell 14

in the main hall."

84.    At approximately 1:30 p.m., Alyssa Sund made a video court appearance from a

visiting room at the jail.  Deputy Matthew Blackshear escorted Ms. Sund to and from her cell

during this process.  During this court appearance, Judge Locke Williams ordered that Ms. Sund

be held in custody until she could post bail.  Her next court appearance was scheduled for December 24, 2018 at 10:30 a.m.

85.    Deputy Andrew Formiller facilitated the video court appearance.  Prior to the appearance, Nurse Kelley spoke with Deputy Formiller "about getting Sund's medication brought into the jail if she was not released in court."  Deputy Formiller's report states: "The nurse said that Sund's medications were in a backpack at the house she was arrested at.  The nurse told me that some of the medications Sund was taking the jail did not supply, but if someone brought her medications in they would be given to her.  The nurse told me that the medications that Sund had spoken to her about were non-emergency type medications.  The nurse told me the medications Sund needed to be on were set up by the jail and would be provided to her."

86.    Deputy Blackshear reported that Ms. Sund began screaming and yelling in her cell shortly after returning from her court appearance.  He said that Ms. Sund was sitting on the floor and saying that she was having a "panic attack."  Sergeant Mohr responded to Ms. Sund's cell.

87.    Sergeant Mohr noted that Ms. Sund "was crying and seemed to be breathing heavily.  I asked her what her problem was.  Sund stated that she had PTSD and was having a panic attack.  She stated that she was sick and wanted her medications."  Sergeant Mohr told her that he would call Officer Wood to see if he could bring her medications to the jail.

88.    After leaving Ms. Sund's cell, Sergeant Mohr spoke with Nurse Kelley, who had been standing nearby.  Sergeant Mohr documented that Nurse Kelley told him "that Sund's medications were not a necessity and that the jail did not stock any of them.  Nurse Kelley told me if the medication [sic] were brought into the jail she would set them up for Sund to take."

**Page 18 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

89.     Nurse Kelley told investigators that she could hear portions of Ms. Sund's interaction with Sergeant Mohr.  She initially heard someone calling for help.  She said that Ms. Sund was throwing a "tantrum" because she had not been released from custody.  She heard Sergeant Mohr telling Ms. Sund: "You were just fine a minute ago."  She said that Sergeant Mohr did not summon her into the conversation and that Ms. Sund was having an emotional issue and not a medical issue.

90.     At approximately 2:11 p.m., Nurse Kelley ended her shift and left the jail.  She began her vacation for the Christmas holiday.  On information and belief, she did not return to the jail until December 27, 2018.

91.     Benton County did not make any arrangements for another nurse to cover Ms. Kelley's shifts during her absence.  Ms. Kelley told investigators that "she is the only nurse, but on call and available by phone 24/7."

92.     At approximately 2:30 p.m., Sergeant Mohr brought Ms. Sund to the booking room to use the phone so she could try to make arrangements to get her medications.  Ms. Sund spent 15–20 in the booking room and made several phone calls.

93.     Sergeant Mohr called Officer Wood regarding Ms. Sund's medications.  Officer Wood agreed to search for them at the arrest location.  Officer Wood then called back to let Sergeant Mohr know that he could not find the medications.

94.     Deputy Blackshear told investigators that Ms. Sund was crying during his cell checks on the afternoon of December 20, 2018.  When he asked her why she was crying, she told him that she wanted her medications.

95.     Ms. Sund also called her mother in the afternoon of December 20, 2018.  Ms. Sund asked her mother to post bond.  Believing that her daughter would be safer under the supervision of jail medical staff than outside the jail, Ms. Sund's mother did not post the bond.

96.     At approximately 2:50 p.m., Dr. Lance Loberg arrived at the jail for his weekly visit.  He remained in the jail until approximately 3:55 p.m.  There is no indication that Dr. Loberg saw Ms. Sund.

97.     On information and belief, Dr. Loberg reviewed Ms. Sund's medical chart while he was at the jail on the afternoon of December 20, 2018.  On information and belief, Dr. Loberg initialed the Physician's Orders in the chart that are dated December 20, 2018.

**December 21, 2018—Alyssa Sund Starts to Experience Back Pain and Stomach Pain**

98.     On Friday, December 21, 2018, at approximately 2:00 a.m., Deputy Tanner Sparks spoke with Alyssa Sund at her cell.  Ms. Sund asked for toilet paper and feminine hygiene products, which Deputy Sparks provided.  Ms. Sund then asked for Pepto Bismol and a muscle relaxer.

99.     Deputy Sparks contacted Sergeant Werdell about Ms. Sund's requests.  Sergeant Werdell told Deputy Sparks that "the jail's nurse, Nurse Kelley, had already been consulted on this matter and it was decided they will not be providing medications to Alyssa Sund not prescribed to her by jail staff."  Deputy Sparks told Ms. Sund that he could not give her a muscle relaxer.  Ms. Sund told Deputy Sparks that "she was having difficulty sleeping or laying down, but she did not specify why."  Deputy Sparks told investigators that he offered to move Ms. Sund back to the holding cell, because she said that the bedding in that cell was more comfortable, but she declined.

100.    At approximately 10:05 a.m., Ms. Sund asked Deputy Nick Miller for a heat pack for her back.  Deputy Miller gave her a heat pack.

101.    At approximately 10:30 a.m., Emery Sund stopped in the hallway in front of Ms. Sund's cell and tried to talk to her.  Deputy Miller "explained that this was a violation of a no-contact order and it would not be allowed."

102.    At approximately 10:41 a.m., Dr. Jon Sobotka arrived at the jail for his weekly visit.  He remained in the jail until approximately 12:54 p.m.  There is no indication that Dr. Sobotka saw Ms. Sund.

103.    At approximately 2:00 p.m., Ms. Sund spoke with Alexis Carrillo in the dayroom. Ms. Carillo told investigators that Ms. Sund "mentioned to her that she did not feel good and may be detoxing."  Ms. Carrillo said that Ms. Sund "spoke about why she was in jail and also spoke about her husband, who was also in jail at the time."  Ms. Sund told Ms. Carrillo that she was disabled and that "her husband helps her with her disabilities."  Ms. Carrillo also said that Ms. Sund did not stay in the dayroom the entire allotted time and returned to her cell early.

104.    Ms. Sund made three phone calls while she was in the dayroom, but she was not able to reach anyone.

105.    At approximately 7:13 p.m., Deputy Doree Johnson gave Ms. Sund two tablets of 250 mg acetaminophen and two tablets of 250 mg ibuprofen because Ms. Sund requested them.

106.    At approximately 9:48 p.m., Deputy Callie Dugger spoke with Ms. Sund at her cell.  Ms. Sund said "she was having some back pain and some stomach pain" and asked for some ibuprofen.  Ms. Sund told Deputy Dugger that "she normally takes 800 mg ibuprofen outside of jail."  Deputy Dugger noted in her report: "I was unsure of any medications she had or what her medical status was, but I was informed by another deputy on shift, that she was seen by

medical.  I told SUND I would contact the nurse to see if she could get some ibuprofen set up by Nurse Kelley for her at regular med passes."

107.    Deputy Dugger gave Ms. Sund another packet of ibuprofen.  This was not recorded in Ms. Sund's medical records.  Deputy Dugger also gave Ms. Sund a heat pack because she was complaining of back pain.

108.    Deputy Dugger noted in her report: "I then contacted Nurse Kelley, who set up a daily ibuprofen dose for med pass during the morning and evening passes.  I set up a card of ibuprofen in the med cart.  I later found out that the medication SUND takes outside of jail, was not going to be provided to her unless it could be brought in by family or friends."

109.    Deputy Dugger told investigators that she contacted Nurse Kelley via text message.  Nurse Kelley confirmed that she got a text message from Deputy Dugger about Ms. Sund.

110.    Benton County, Deputy Dugger and Nurse Kelley did not preserve that text message.  No one provided that text message to the Linn County Sheriff's Office, which investigated Ms. Sund's death.

111.    On December 27, 2018, Nurse Kelley wrote a chart note about her interaction with Deputy Dugger on December 21, 2018.  The chart note reads: "RN was contacted by Deputy Dugger on 12/21/18 @ 2204 for pt request of ibu 800mg.  Pt already had an OTC dose of ibu this evening.  Higher dose set up to start in the AM of 12/22/18.  On 12/23/18, RN notified by Captain Rabago of pt's passing, cause unknown."

112.    Nurse Kelley told investigators that she accessed the health records system and "updated their records to allow Alyssa Sund to have the 800 milligram ibuprofen beginning the

**Page 22 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

following day, as Alyssa Sund had already taken her 400 milligram dose that day." The MAR shows this order, dated December 21, 2018.

113.    Ms. Sund's medical record also contains a third entry in the section for "Physician's Orders." The third entry in that medical record is dated December 21, 2018 and timed 10:04 p.m. The entry states: "Ibuprofen 800mg PO BID PRN pain." The entry then states: "to Dr. Loberg/Dep Dugger/[illegible]."

114.    At approximately 11:01 p.m., Deputy Dugger brought a new heat pack to Ms. Sund because she requested one.

### December 22, 2018—Alyssa Sund Vomits Repeatedly and Is Moved to a Holding Cell for Observation

115.    On Saturday, December 22, 2018, at approximately 2:00 a.m., Sergeant Werdell spoke with Alyssa Sund at her cell. Ms. Sund asked for "something for her stomach" because she had been throwing up. Sergeant Werdell got some "Pepto" and gave it to Ms. Sund. On information and belief, "Pepto" is an over-the-counter medication known as Pepto-Bismol.

116.    At approximately 2:53 a.m., Deputy Dugger noticed that Ms. Sund had vomited. Deputy Dugger saw vomit on Ms. Sund's bedding and pants. Deputy Dugger gave a Gatorade to Ms. Sund "to help dehydration."

117.    At approximately 3:13 a.m., Deputy Dugger and Deputy Tanner Sparks brought new bedding and new pants to Ms. Sund's cell. According to their reports, Ms. Sund "refused and said she would do it later."

118.    At approximately 4:45 a.m., Deputy Dugger, Deputy Sparks and Deputy Ethan Garrison went back to Ms. Sund's cell with new bedding and new pants. Ms. Sund gave them her dirty laundry and took the clean laundry.

119.    At approximately 6:19 a.m., Deputy Dugger brought breakfast to Ms. Sund.
Deputy Dugger said that Ms. Sund "was still not feeling well" and did not make a move to get up
for her breakfast.

120.    At approximately 6:22 a.m., Deputy Sparks brought an ibuprofen to Ms. Sund, as
directed by the MAR. Ms. Sund "refused to take the medication telling me that 'it will tear up
my stomach.'" Ms. Sund asked for some Pepto tablets and a heat pack. Deputy Sparks provided
those items.

121.    Deputy Sparks described his observations of Ms. Sund in his report: "Throughout
my shift on 12/22/18, I heard SUND throw up several times. I had been told by Deputy Dugger
that SUND had thrown up on some of her bedding and her pants. At 0309 hours I contacted
SUND and asked her if she wanted to come up to a waiting cell but she declined. SUND was
coherent and able to sit up and speak with me. Since SUND did not want to leave her cell and
she was able to communicate with me in a coherent manner, I let her stay in her cell and I
brought her a 'barf bag,' new bedding, and pants. SUND declined to change her bedding at that
time."

122.    Deputy Garrison described his observations of Ms. Sund in his report: "On the
shift of 12/22/2018, Inmate Alyssa Sund was being loud periodically throughout the night. It
sounded like she was forcing herself to puke. Sund asked me for a heat pack when I first came
on shift. Before the next round was due, Deputy Dugger had given Sund a heat pack. During the
shift, Deputy Dugger gave Sund new clothes to change into because Sund had puked on her
clothing. I talked with Sund at approximately 0445 about keeping the noise level down. I
counseled Sund informing her that if she was unable to be quieter then she would be moved up to

an observation cell so that other inmates could sleep.  Sund was quiet after that and the

remainder of my shift, which ended at 0700."

123.    Deputy Garrison told investigators that he had observed similar people "when

people are detoxing from heroin" because people who are detoxing "can have a hard time

keeping food down or controlling their bowel movements."

124.    Sergeant Werdell told investigators that, while working in the control room later

in her shift, "she could hear Alyssa Sund retching and vomiting on the microphones for the

cameras in the hallway outside Alyssa Sund's cell."  In her report, Sergeant Werdell wrote: "I

could hear SUND throwing up throughout the night on the hall speaker.  Other deputies working

that night (Dugger, Sparks, and Garrison) had contact with SUND a few times.  At one point

SUND was provided a Gatorade to keep hydrated and some new bedding and pants, I believe,

due to hers having some vomit on them.  I asked (I believe Deputy Sparks) if SUND needed to

be moved up for observation.  I was told that SUND said she did not want to be moved up to an

observation cell, and that she was fine.  As the shift went on, it seemed like SUND was feeling

better based on the fact that I could not hear her on the audio throwing up anymore."

125.    Deputy Nick Miller and Deputy John Herrick both wrote in their reports that the

graveyard shift told them that Ms. Sund had been vomiting all night and that the graveyard shift

suspected that she was forcing herself to vomit.

126.    At approximately 7:13 a.m., Deputies Miller and Herrick approached Ms. Sund's

cell.  Ms. Sund took some clean linens and asked to take a shower.  Ms. Sund said that she

"needed a new blanket because she used her other blanket to clean up throw up."  Ms. Sund

"asked for a clean shirt because she had gotten vomit on her current one."  Deputy Herrick

brought her a clean shirt.  While she was in the shower, Deputy Miller looked into her cell and

reported to Deputy Herrick that he saw vomit on the floor.  Ms. Sund returned to her cell after her shower at approximately 7:34 a.m.

127.    Deputy Miller wrote in his report that he could hear Ms. Sund "vomiting in her cell throughout the morning after that."  Deputy Miller told investigators that "she continued to make loud retching and vomiting noises" after she returned to her cell.  Deputy Herrick wrote in his report that he could "hear her yelling in the main hall."

128.    At approximately 8:26 a.m., Deputy Miller went to Ms. Sund's cell because she was "yelling something that I could not make out."  Ms. Sund told him that she had been vomiting and "couldn't keep anything down."  Deputy Miller "noticed that she had puked on her floor next to her bed."  Ms. Sund asked him for some Milk of Magnesia, but Deputy Miller pointed out that it wouldn't help and she agreed.  Deputy Miller "told her that if anything changes I would get her something for her stomach if she thought it would help.  I ended our interaction at this point, and continued to hear SUND vomiting behind the gate periodically."

129.    Deputy Miller reported to Sergeant Mohr that Ms. Sund "stated she was sick and had been throwing up."  Sergeant Mohr wrote in his report that he "could hear Sund over the main hall audio occasionally yelling and knocking on her cell door."  Sergeant Mohr told investigators that Deputy Miller told him that Ms. Sund "was sick and appeared to be dry heaving or actually throwing up."  Deputy Miller told investigators that he advised Sergeant Mohr that Ms. Sund "would probably need to be moved to a holding cell due to the volume and frequency of her vomiting, as well as to keep her under observation as she seemed to either be getting worse or making herself seem worse."

130.    At approximately 9:30 a.m., Sergeant Mohr told Deputy Miller to move Ms. Sund to a holding cell because "Sund had been making a lot of noise and was disrupting other

**Page 26 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

inmates." Sergeant Mohr "also wanted to be able to watch Sund from the camera" inside the

holding cell. Deputy Herrick wrote in his report that Ms. Sund was moved to the holding cell

"due to her puking in her cell and because her constant yelling was bothering other inmates."

The Benton County Jail Daily Log states that Ms. Sund was "moved to holding * * * due to

yelling." An event log created by Captain Diana Rabago states that Ms. Sund was "[m]oved to

Holding 1 due to behavioral outburst."

131.    Ms. Sund was placed in Holding Cell 1—the same holding cell where she was

housed after her asthma attack two days earlier.

132.    After Ms. Sund was moved to Holding Cell 1, the jail staff began a "Close

Observation Log" for her. This log indicated that Ms. Sund was "moved up because sick."

133.    At approximately 9:52 a.m., Ms. Sund started to yell, hit the door in the holding

cell, and hit a Gatorade bottle against the toilet. Deputy Miller wrote that Ms. Sund "was yelling

at deputies and cursing at us for having moved her up to Holding 1. She was demanding a phone

call, and that we let her out of that cell. SUND had brought a Gatorade bottle up to holding with

her, and she began to hit it on her toilet in order to be as loud as she could. SUND was

counseled multiple times not to yell or hit the door/toilet while she was in Holding 1." Deputy

Miller told investigators that Ms. Sund "complained that it was too cold in the holding cell."

Deputy Herrick wrote that Ms. Sund "continued to yell and hit the toilet with a Gatorade bottle.

She was specifically yelling to let her go and that she needed to use the phone. She was told

multiple times that she needed to be quiet, and that she was not going to receive anything until

she started to behave."

134.    At approximately 10:23 a.m., Deputy Miller and Deputy Herrick moved Ms. Sund

from Holding Cell 1 to Holding Cell 2. Holding Cell 2 only has a grated hole in the middle of

the floor.  Holding Cell 2 does not have a sink or a toilet.  Sergeant Mohr wrote that he asked the deputies to move Ms. Sund from Holding Cell 1 to Holding Cell 2.  Sergeant Mohr told investigators that he made this decision because "this would allow Ms. Sund to be upset without making all the noise."

135.    At approximately 10:29 a.m., Ms. Sund defecated in the corner of Holding Cell 2. There is no toilet in Holding Cell 2.

136.    Deputy Herrick told investigators that Ms. Sund asked for a blanket at some point because she was cold.

137.    Deputy Cody Ash started his shift at approximately 10:40 a.m.  Deputy Ash told investigators that "he was told that Alyssa Sund was in the holding cell due to behavioral issues that occurred earlier in the day."

138.    Deputy Doree Johnson started her shift at approximately 2:31 p.m.  Deputy Johnson wrote in her report that Sergeant Mohr told her that Ms. Sund "had been brought up to H1 and then moved to H2 for behavioral issues earlier in the day but he felt that she would be fine to move back to her original cell (cell #14) when I was ready to do it."  Deputy Johnson told investigators that she had been told that Ms. Sund was "needy" and had been "acting out all day."

139.    At approximately 3:34 p.m., Deputy Johnson spoke with Ms. Sund in Holding Cell 2.  Deputy Johnson wrote in her report that Ms. Sund apologized for yelling and agreed to clean the cell.  Deputy Johnson told investigators that Ms. Sund said that she was cold.

140.    At approximately 3:58 p.m., Deputy Johnson brought the cleaning cart to Ms. Sund, who cleaned Holding Cell 2.

141.    At approximately 4:39 p.m., Deputy Thomas White started his shift.  Deputy White wrote in his report that Deputy Johnson told him that Ms. Sund "was housed in Holding Cell #2 because of behavioral issues throughout the day."

142.    At approximately 5:36 p.m., Deputy Johnson, Deputy White and Deputy Ash moved Ms. Sund back to Cell 14.  Ms. Sund cleaned up some vomit on the floor of Cell 14 and was given a clean blanket.

143.    At approximately 7:23 p.m., Deputy White offered the prescribed dose of ibuprofen to Ms. Sund.  Ms. Sund told investigators that Ms. Sund "refused her prescribed ibuprofen (stating she didn't need it)" and asked for Pepto tablets.  Deputy White gave some Pepto tablets to Ms. Sund.

144.    Deputy Johnson told investigators that she thought Ms. Sund "felt bad" because she wanted her meds.  Deputy Johnson knew that "most of the meds Alyssa Sund had listed at booking had not been given to her per the nurse."  Deputy Johnson recalled Ms. Sund throwing up during her previous shift the day before.

145.    In Ms. Sund's medical record, Deputy Johnson noted that Ms. Sund did not receive this dose of ibuprofen because she was "non-compliant."

### December 23, 2018—Alyssa Sund Is Found Dead in Her Cell

146.    On Sunday, December 23, 2018, at approximately 6:19 a.m., Deputy Dugger served breakfast to Ms. Sund.  Deputy Dugger wrote in her report that Ms. Sund "stood up out of bed and took the breakfast from me."  Deputy Dugger told an investigator that she "had no verbal communication with Alyssa Sund that day or morning."

147.    At approximately 6:20 a.m., Deputy Garrison gave Ms. Sund her prescribed dose of ibuprofen.  Deputy Garrison wrote in his report that Ms. Sund "opened her mouth and showed

that she had swallowed the medication.  Sund was standing in her doorway for the medication pass."

148.    At approximately 7:00 a.m., Deputy Herrick and Deputy Lancaster began their shift.  Deputy Herrick wrote in his report that he "received briefing from graveyard that [Ms. Sund] had refused her ibuprofen at morning med pass."  Deputy Lancaster wrote in his report that he "was briefed by the graveyard shift who stated nothing out of the ordinary."

149.    At approximately 7:10 a.m., Deputy Herrick or Deputy Lancaster offered a shower to Ms. Sund.  Deputy Herrick told an investigator that he offered a shower to Ms. Sund and that her response was "a grunt or groan."  Deputy Herrick also told an investigator that Ms. Sund's head and body were completely covered by her blanket.  Deputy Lancaster told an investigator that Deputy Herrick offered the shower to Ms. Sund and that he did not have any interaction with her.

150.    In his written report, Deputy Herrick wrote that Ms. Sund "was offered a shower by Deputy Lancaster, and I could hear her make a noise like a grunt, which sounded like a decline.  Deputy Lancaster marked her shower as a refusal."  In his written report, Deputy Lancaster wrote that he "asked SUND 'would you like a shower today or are you good?'  Sund replied with 'I'm good.'  I then marked SUND down as a refusal on our morning log report."

151.    At approximately 8:02 a.m., Deputy Herrick and Deputy Lancaster performed their hourly cell checks.  Deputy Lancaster wrote that they "stood outside SUND's cell, and did not hear anything out of the ordinary."  Deputy Herrick wrote that they "stood outside of Cell 14 of Inmate SUND and heard nothing."  Deputy Herrick acknowledged to an investigator that the video outside Ms. Sund's cell shows that he and Deputy Lancaster did not look into her cell during this check.

**Page 30 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

152.    The jail records indicate that Deputy Lancaster performed a cell check at approximately 9:00 a.m.  Deputy Lancaster told an investigator that "nothing looked out of the ordinary at that time."  Deputy Lancaster said that she "was lying in bed.  I asked what he could see and Deputy Lancaster said he could not see her face because of the way the bed was and the way her body was laying.  He said her blanket was draped over her, but he could see both of her legs."  Deputy Lancaster wrote in his report that he "observed SUND lying with her feet, and legs out of the covers, and did not see SUND in any signs of distress."

153.    The jail records indicate that Deputy Herrick and Deputy Lancaster performed a cell check at approximately 9:33 a.m.  Deputy Lancaster wrote in his report that he "observed SUND in the same position as 31 minutes prior."

154.    The jail records indicate that Deputy Herrick and Deputy Lancaster performed a cell check at approximately 10:33 a.m.  Deputy Herrick wrote in his report that he "observed Inmate SUND as she appeared to be in a sleeping position, on her side and completely covered by her blanket.  She did not move or make any sound.  Nothing about her appearance seemed disheveled or traumatic."  Deputy Herrick told an investigator that Ms. Sund did not respond when he said "lunch."

155.    At approximately 10:55 a.m., Sergeant Keith Hunnemuller began his shift.  Sergeant Hunnemuller told an investigator that "he was told that Ms. Sund had been acting out the day before by banging and kicking the doors, as well as yelling a lot.  He said that Ms. Sund had been brought to the intake area and placed in a holding type cell because of her behavior."

156.    The jail records indicate that Sergeant Hunnemuller, Deputy Herrick and Deputy Lancaster served lunch and performed a cell check at approximately 11:08 a.m.  Deputy Herrick

**Page 31 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

wrote in his report that he opened the door of Ms. Sund's cell and that "she still appeared to be sleeping so I placed her lunch on her cell room sink and closed her door."

157.    The jail records indicate that Sergeant Hunnemuller and Deputy Herrick and Deputy Lancaster picked up lunch trash and performed a cell check at approximately 12:05 p.m. Deputy Herrick told an investigator that Ms. Sund did not respond when he said "trash."  Deputy Herrick said that he "stared at her, trying to see her breathing.  He said he did not see any movement, but it did not seem odd to him because she was 'heavy set,' and still completely covered with the blanket.  He said he then stepped back into her cell and said, 'Trash' two times loudly.  When Ms. Sund did not respond, he shook her ankle and got no response.  He said he uncovered her foot and saw her skin was 'all blotchy and purple.'"  Deputy Herrick said that he "pulled the blankets down, exposing her face.  Deputy Herrick said he could tell Ms. Sund had been deceased for some time."

158.    Sergeant Hunnemuller and Deputy Lancaster both came to Ms. Sund's cell.  They observed Ms. Sund and agreed that she was dead.  Deputy Lancaster wrote in his report that Ms. Sund "had purple, and blue coloration on her legs with rigidity starting in her limbs as well."

159.    Paramedics arrived at the jail at approximately 12:09 p.m.  They did not make any resuscitation efforts because Ms. Sund already was in rigor mortis.

160.    After Ms. Sund's death, an investigator asked Sergeant Hunnemuller if the deputies would notice if someone had stopped breathing during the hourly cell checks.  Sergeant Hunnemuller responded: "Not when they're covered up like that."

161.    After Ms. Sund's death, an investigator asked Captain Rabago "if during cell checks, corrections deputies check to see if an inmate is alive and breathing.  Captain Rabago said she prefers that deputies do so, but they do not necessarily check for breathing or movement.

I asked Captain Rabago if jail policy requires them to check for breathing or movement, and she said it does not."

162.    After Ms. Sund's death, Emery Sund was placed in lockdown.  At some point during the afternoon, an investigator interviewed Mr. Sund.  The investigator noted that Mr. Sund "was visibly upset" when he learned that Ms. Sund had died.  Mr. Sund told the investigator that he could hear Ms. Sund "throwing up in the jail for a 'few days.'"  Mr. Sund was released from the Benton County Jail later that day.

163.    Emery Sund could hear Alyssa Sund vomiting for multiple days.  He also could hear her calling out his name.  Emery Sund repeatedly asked the jail deputies to check on Ms. Sund and make sure she was okay.

164.    On the afternoon of Ms. Sund's death, an investigator interviewed Alexis Carrillo, who was housed next to Ms. Sund in Cell 13.  Ms. Carrillo told the investigator that she heard Ms. Sund "throwing up a lot.  I asked when that was and she said it was the entire time they were next to each other.  I suggested it was all day and Ms. Carrillo added that it was all night, and that she would sometimes wake up and hear the woman throwing up as well.  I asked when it started and she said it was from the time she (Ms. Carrillo) was put into the cell next to the woman.  I asked if it ever stopped and she said it stopped yesterday sometime.  Ms. Carrillo then said that the woman got really quiet last night."  Ms. Carrillo also told the investigator that Ms. Sund was throwing up "pretty constantly" but got quiet the night before.  "She said she was concerned for the woman because it was so abrupt, but then she thought the woman may have fallen asleep."

165.    Alyssa Sund was a medically fragile person who suffered from pre-existing conditions.  Defendants callously disregarded her medical needs and she would not have died if she had received proper medical attention.

166.    On information and belief, no one was disciplined or fired as a result of Ms. Sund's death.  Benton County Undersheriff Greg Ridler told a reporter that no new policies were put in place as a result of her death.

167.    The BCSO website currently states: "With a larger jail and appropriate medical staff, the expense of rental beds and off site medical care could be drastically reduced or eliminated."

168.    Notice pursuant to the Oregon Tort Claims Act was given to Defendant Benton County within the time prescribed by law.

## FIRST CLAIM FOR RELIEF

### (Civil Rights Claim—8th and/or 14th Amendments—42 U.S.C. § 1983)

169.    Plaintiff The Estate of Alyssa Sund realleges and incorporates herein as though set forth in full paragraphs 1 through 168, above.

170.    Defendants Loberg, Sobotka, Kelley, Mohr, Werdell, Blackshear, Dugger, Garrison, Herrick, Johnson, Lancaster, Miller, Sparks and White were deliberately indifferent to Alyssa Sund's serious medical needs and to her rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

  a.    In failing to ensure that Alyssa Sund was properly screened before being admitted to the Benton County Jail;

  b.    In failing to transfer Alyssa Sund to a hospital instead of admitting her to the Benton County Jail;

  c.    In failing to provide Alyssa Sund with proper medical attention to her serious medical needs;

d.      In failing to provide Alyssa Sund with her prescribed medications;

e.      In failing to ensure that Alyssa Sund was seen by a doctor while she was in the Benton County Jail;

f.      In failing to conduct proper cell checks on Alyssa Sund; and

g.      In failing to transfer Alyssa Sund from the Benton County Jail to a hospital for diagnosis and treatment of her serious medical needs.

171.    Defendants Loberg, Sobotka, Kelley, Jackson, and Rabago were deliberately indifferent to Alyssa Sund's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

a.      In failing to ensure that employees of the Benton County Jail had proper training in responding to the serious medical needs of jail inmates;

b.      In failing to ensure that employees of the Benton County Jail had proper training in the screening of people being admitted to the Benton County Jail; and

c.      In failing to ensure that employees of the Benton County Jail had proper training in conducting cell checks.

172.    As a direct result of the actions and inactions of Defendants as set forth in paragraphs 170 and 171, above, Alyssa Sund endured and suffered severe physical and emotional distress, her medical condition was exacerbated, and she died.  Ms. Sund's mother, husband and children have been denied her love, society and companionship.  Alyssa Sund's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

173.    The actions of Defendants Loberg, Sobotka, Kelley, Jackson, Rabago, Mohr, Werdell, Blackshear, Dugger, Garrison, Herrick, Johnson, Lancaster, Miller, Sparks and White were recklessly indifferent to the civil rights of Alyssa Sund, and callously disregarded Alyssa Sund's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

174.     Plaintiff The Estate of Alyssa Sund is entitled to her necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## SECOND CLAIM FOR RELIEF

**(Civil Rights Claim—8th and/or 14th Amendments—42 U.S.C. § 1983—*Monell* Claims)**

175.     Plaintiff The Estate of Alyssa Sund realleges and incorporates herein as though set forth in full paragraphs 1 through 174, above.

176.     The moving forces that resulted in the deprivation of the Eighth and/or Fourteenth Amendment rights of Alyssa Sund were the following policies, customs or practices of Benton County:

  a.     A policy, custom or practice of providing insufficient medical coverage at the Benton County Jail;

  b.     A policy, custom or practice of not providing proper receiving or intake screenings for people detained in the Benton County Jail;

  c.     A policy, custom or practice of failing to ensure that employees of the Benton County Jail had proper training in responding to the serious medical needs of jail inmates;

  d.     A policy, custom or practice of failing to ensure that employees of the Benton County Jail had proper training in the screening of people being admitted to the Benton County Jail;

  e.     A policy, custom or practice of failing to ensure that employees of the Benton County Jail had proper training in conducting cell checks;

  f.     A policy, custom or practice of hiring personnel indifferent to the medical needs of jail inmates; and

  g.     A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for jail inmates.

177.     The policies of defendant Benton County posed a substantial risk of causing substantial harm to Benton County Jail inmates, and Benton County was aware of the risk.

**Page 36 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**

178.    As a direct result of the policies, customs or practices of Benton County, Alyssa Sund endured and suffered severe physical and emotional distress, her medical condition was exacerbated, and she died.  Ms. Sund's mother, husband and children have been denied her love, society and companionship.  Alyssa Sund's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

179.    Plaintiff The Estate of Alyssa Sund is entitled to her necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## THIRD CLAIM FOR RELIEF

### (Negligence—Wrongful Death)

180.    Plaintiff The Estate of Alyssa Sund realleges and incorporates herein as though set forth in full paragraphs 1 through 179, above.

181.    The actions of Benton County, acting by and through its employees and agents, were negligent in one or more of the following particulars:

a.    In failing to ensure that Alyssa Sund was properly screened before being admitted to the Benton County Jail;

b.    In failing to transfer Alyssa Sund to a hospital instead of admitting her to the Benton County Jail;

c.    In failing to provide Alyssa Sund with proper medical attention to her serious medical needs;

d.    In failing to provide Alyssa Sund with her prescribed medications;

e.    In failing to ensure that Alyssa Sund was seen by a doctor while she was in the Benton County Jail;

f.    In failing to conduct proper cell checks on Alyssa Sund;

g.    In failing to transfer Alyssa Sund from the Benton County Jail to a hospital for diagnosis and treatment of her serious medical needs;

h.    In failing to ensure that employees of the Benton County Jail had proper training in responding to the serious medical needs of jail inmates;

i.    In failing to ensure that employees of the Benton County Jail had proper training in the screening of people being admitted to the Benton County Jail; and

j.    In failing to ensure that employees of the Benton County Jail had proper training in conducting cell checks.

182.    The actions of Defendants Loberg, Sobotka, and Kelley were negligent in one or more of the following particulars:

a.    In failing to ensure that Alyssa Sund was seen by a doctor while she was in the Benton County Jail;

b.    In failing to ensure that employees of the Benton County Jail had proper training in responding to the serious medical needs of jail inmates;

c.    In failing to ensure that employees of the Benton County Jail had proper training in the screening of people being admitted to the Benton County Jail;

d.    In failing to provide Alyssa Sund with proper medical attention to her serious medical needs;

e.    In failing to provide Alyssa Sund with her prescribed medications; and

f.    In failing to transfer Alyssa Sund from the Benton County Jail to a hospital for diagnosis and treatment of her serious medical needs.

183.    As a direct result of the actions and inactions of Defendants Benton County, Loberg, Sobotka, Kelley, and each of them, Alyssa Sund endured and suffered severe physical and emotional distress, her medical condition was exacerbated, and she died.  Ms. Sund's mother, husband and children have been denied her love, society, and companionship.  Alyssa Sund's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

## FOURTH CLAIM FOR RELIEF

**(Intentional Infliction of Emotional Distress)**

184.    Plaintiff Emery Sund realleges and incorporates herein as though set forth in full paragraphs 1 through 183, above.

185.    While incarcerated at Benton County Jail together, Plaintiff Emery Sund heard his wife Alyssa Sund vomiting and crying out to him for help.  Plaintiff Emery Sund repeatedly asked agents and employees of Defendant Benton County to assist Alyssa Sund, but these requests fell on deaf ears, and Emery Sund was powerless to help as an incarcerated person (he was even reprimanded for attempting to speak with Alyssa Sund).

186.    Having to listen to the intense suffering of his wife Alyssa Sund and being powerless to help, and knowing that he could have taken actions to prevent his wife's death but for their joint incarceration, has caused Plaintiff Emery Sund to suffer severe mental and emotional distress.  Such distress was certain or substantially certain to result from the actions of Defendant Benton County, acting by and through its agents and employees.

187.    The actions of Defendant Benton County, acting by and through its agents and employees, constitute an extraordinary transgression of the bounds of socially tolerable conduct and exceeded any and all reasonable limits of social toleration.  No one should have to listen to his wife die, especially while that person is in a position where he is powerless to assist and those that can assist refuse to do so.

188.    Plaintiff Emery Sund is entitled to compensatory damages as a result of the severe emotional distress caused by Defendant Benton County and its agents and employees.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**(Negligent Infliction of Emotional Distress)**

189.    Plaintiff Emery Sund realleges and incorporates herein as though set forth in full paragraphs 1 through 188, above.

190.    Defendant Benton County, acting through its agents and employees, negligently caused serious bodily injury and death to Alyssa Marie Sund.  Emery Sund contemporaneously perceived his wife Alyssa Sund's suffering and death.

191.    Plaintiff Emery Sund had a legally recognizable right to avoid being forced to perceive his wife's suffering and death.

192.    Plaintiff Emery Sund suffered damages as alleged in paragraph 188 above.

**DEMAND FOR JURY TRIAL**

193.    Plaintiffs demand Trial by Jury.

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    **On the First Claim for Relief**, for judgment in favor of plaintiff The Estate of Alyssa Sund and against defendants Loberg, Sobotka, Kelley, Jackson, Rabago, Mohr, Werdell, Blackshear, Dugger, Garrison, Herrick, Johnson, Lancaster, Miller, Sparks and White, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, for punitive damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

2.    **On the Second Claim for Relief**, for judgment in favor of plaintiff The Estate of Alyssa Sund and against defendant Benton County for compensatory damages in whatever amount the jury concludes is appropriate and for necessarily and reasonably incurred attorney fees and costs;

3.      **On the Third Claim for Relief**, for judgment in favor of plaintiff The Estate of Alyssa Sund and against defendants Benton County, Loberg, Kelley, and Sobotka for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs;

4.      **On the Fourth Claim for Relief**, for judgment in favor of plaintiff Emery Sund and against defendant Benton County for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs; and

5.      **On the Fifth Claim for Relief**, for judgment in favor of plaintiff Emery Sund and against defendant Benton County for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs.

DATED this 6th day of November, 2020.

TONKON TORP LLP

By:   *s/ Darian Stanford*
        Darian Stanford, OSB No. 994491
          Direct Dial:  503.802.2028
          Fax:  503.274.8779
          E-Mail:  darian.stanford@tonkon.com
        Michael Willes, OSB No. 141806
          Direct Dial: 503.802.5737
          Fax: 503.274.8779
          E-Mail: michael.willes@tonkon.com
        Kalia Walker, OSB No. 154434
          Direct Dial: 503.802.2031
          Fax: 503.274-8779
          E-Mail: kalia.walker@tonkon.com

                Attorneys for Plaintiffs

040431\00001\11696165v1

**Page 41 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & SUPP. CLAIMS**